**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

LIZA MIZEL, individually and on
behalf of all others similarly situated,

      Plaintiff,

v.                                                  Case No. 8:25-cv-1034-KKM-AEP

LENDVIA, LLC,

      Defendant.

_____

## **ORDER**

Defendant Lendvia, LLC, moves to compel arbitration of Liza Mizel's

claims against it and to stay this proceeding. *See* Mot. (Doc. 16). Mizel opposes

and claims that the purported arbitration agreement, including the delegation

provision, are fabricated. *See* Resp. (Doc. 22). Because Lendvia fails to meet its

burden to show that an agreement to arbitrate existed between it and Mizel, I

deny the motion.

### I.    BACKGROUND

This action is a putative class action under the Telephone Consumer

Protection Act (TCPA) and the Florida Telephone Solicitation Act (FTSA).

Mizel alleges that Lendvia "violated several provisions of both the TCPA and

FTSA by (1) making calls to Plaintiff and the proposed Class . . . using an

automated system for the selection or dialing of telephone numbers without

prior express written consent; (2) making calls using an artificial or prerecorded voice; and (3) initiating telephone solicitations to residential telephone numbers registered on the National Do Not Call Registry ("DNC") without prior express written consent." Compl. (Doc. 1) ¶ 2. After answering the complaint, Lendvia moves to compel arbitration. *See* Answer (Doc. 11); Mot.

In support, Lendvia includes a declaration from Chase Webb, Lendvia's Vice President of Business Strategy. Webb Decl. (Doc. 16-1). Attached to the declaration is a copy of the Terms of Use from Lendvia's website, which is a clickwrap contract to which Webb claims Mizel assented. *See id.* ¶ 30; *id.* at 16–25. Lendvia also submits, under seal, a screen recording either captured in real time, or recreated based on other data captured in real time, of someone filling out the clickwrap agreement. *See* Recording (Doc. 27); Webb Decl. ¶ 24 (describing the recording as "a video replay of the user's exact website activity during the registration process"). Lendvia alleges that Mizel completed the form. *See, e.g.*, Webb Decl. ¶ 27. To be clear, the recording does not show the person making the inputs or otherwise reveal that person's identity beyond the information submitted in the form. *See* Recording. Lendvia filed the recording under seal because it contains what Lendvia believes is Mizel's social security

number. *See* (Doc. 16-4) at 1. Webb includes screenshots from the recording throughout his declaration. *See generally* Webb Decl.

Webb's declaration is based upon "[his] own personal knowledge, including knowledge acquired in the course and scope of [his] job responsibilities and through the review of pertinent documents maintained as business records by Lendvia in the course and scope of Lendvia's business." *Id.* ¶ 1. "To apply for financial services through the Website, online applicants must complete a three-step clickwrap agreement." *Id.* ¶ 7. Step one requires the user to select "the amount of the loan requested and then from a dropdown menu identif[y] the purpose of the loan." *Id.* ¶ 8. The user then clicks a "Continue" button and fills in his or her contact information in step two. *See id.* ¶ 9. The applicant must provide his or her "full name, home address, email address, and social security number." *Id.* The applicant then clicks another "Continue" button to move to step three. *Id.* Above this "Continue" button is an arbitration agreement: "By clicking CONTINUE, I express my understanding and consent electronically via E-sign that I acknowledge, agree and consent to receive email marketing and the Privacy Policy and Terms of Use which includes binding arbitration." *Id.* ¶¶ 9–10. "Privacy Policy" and "Terms of Use" are hyperlinked to new windows that display those documents. *Id.* ¶ 10. In step three, the user enters a phone number and clicks a box to indicate consent,

3

again, to the Privacy Policy and Terms of Use, including binding arbitration. *See id.* ¶¶ 11–12. The Terms of Use contain an arbitration agreement, which itself includes a delegation provision. *See id.* ¶¶ 12–14; *id.* at 20–23.

Lendvia has the screen recording because it "maintains records of all users that execute the clickwrap agreement" on its website. *Id.* ¶ 15. This record is called a "Verified Consent" and "identifies the date and time of user activity executing the clickwrap agreement, the URL for the website visited, and other associated metadata." *Id.* Although the recording includes an IP address, *see id.* at 27, Lendvia's Chief Technology Officer, Kash Izadseta, swears that this information is useless for determining the identity or location of the user executing the clickwrap agreement because it is a "dynamic IP address" that is "randomly selected," "changes frequently," and "does not correspond to the location of the cellular device." *See* Izadseta Decl. ¶¶ 1, 3; Mot. at 14 (explaining that the IP address captured by the Verified Consent is a "dynamic IP address"). Mizel does not challenge this assertion. At bottom, the Verified Consent establishes two things: that "the user completed the clickwrap agreement on the Website," and that "Lendvia has received the user's consent prior to contacting the user." Webb Decl. ¶ 16.

Webb contends that, based upon his review of the Verified Consent, "Mizel completed each of the three steps of the clickwrap agreement on the

4

Website and consented to be contacted and to mandatory arbitration." *See id.* ¶ 22. According to Webb, the Verified Consent at issue "shows that, on August 1, 2024 at 11:28 a.m. *an individual* visited the Website via an Apple iOS operating system on a mobile device using the Apple Safari browser." *Id.* ¶ 23 (emphasis added). "At Step 1, *the user* expressed interest in borrowing $75,000 for the purpose of a personal loan." *Id.* ¶ 25 (emphasis added). "After clicking 'Continue,' *the user* proceeded to Step 2 and provided her contact information, including sensitive personal information such as home address, social security number, and email address." *Id.* ¶ 26 (emphasis added). "As shown in the screenshot" for step three, "the user here was Plaintiff Liza Mizel." *Id.* ¶ 27.

The screenshot shows that the form was filled out in the name of "Lisa Mize," not Liza Mizel. *See id.* It, and subsequent screenshots, also include Mizel's correct home address, phone number, and email address. *See id.* ¶¶ 27, 29; Resp. at 2; Reply (Doc. 25) at 7. The social security number, which is redacted in the screenshots, is viewable in the screen recording under seal. *Compare* Webb Decl. ¶ 27, *with* Recording 1:03–1:27. Mizel swears that the social security number in the video is not hers. Mizel Decl. (Doc. 22-2) ¶ 16.

Further, Mizel swears that she has "never, at any time, visited the website shown in [the] video, nor [has she] ever visited any LendVia website." *Id.* ¶ 3. She has "never, at any time, filled out any online loan application form

for LendVia." *Id.* ¶ 4. She has "never, at any time, had any personal or business relationship with Lendvia." *Id.* ¶ 5. In fact, she "never had knowledge of the existence of Lendvia prior to receiving unwanted telephone communications to [her] cell phone." *Id.* ¶ 6. She swears that "whoever entered that information into [Lendvia's] website absolutely was not [her]." *Id.* ¶ 12. Nor did she "authorize anyone else to enter [her] information." *Id.* She "would never input [her] personal information—let alone [her] Social Security Number—into an unfamiliar website or online loan platform—particularly one operated by a company that [she] did not know and trust." *Id.* ¶ 13. Mizel has "no interest whatsoever in loan products of the type that Lendvia appears to offer." *Id.* ¶ 17. Were she to have such interest, she "would obviously use [her] correct name and correct Social Security Number in order to obtain the loan." *Id.*

## II.   LEGAL STANDARDS

"Federal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements." *Emps. Ins. Of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001). The Federal Arbitration Act (FAA) reflects a liberal federal policy favoring arbitration. *Jpay, Inc. v. Kobel*, 904 F.3d 923, 929 (11th Cir. 2018). If parties agree to arbitrate a dispute, the court must enforce that agreement. *Id.*

Of course, "the FAA does not allow a court to compel arbitration unless it is satisfied that the parties agreed to arbitrate." *Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343, 1346 (11th Cir. 2025) (citing *Coinbase, Inc. v. Suski*, 602 U.S. 143, 147–49 (2024)). "Before referring a dispute to an arbitrator, therefore, the court determines whether a valid arbitration agreement exists." *Id.* (quoting *Coinbase*, 602 U.S. at 149). When a party seeking to avoid arbitration argues that no agreement exists, "[s]tate law generally governs" because "whether an arbitration agreement exists at all is simply a matter of contract." *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (citation modified).

The Court employs a "summary judgment-like standard" to determine whether an arbitration agreement exists. *Id.* at 1333. If there is a genuine dispute of fact concerning the making of the arbitration agreement, the FAA instructs that "the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default [of the arbitration provision] . . . the court shall hear and determine such issue." 9 U.S.C. § 4; see also *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1346 (11th Cir. 2017). "A dispute is not 'genuine' if it is unsupported by the evidence or is created by evidence that is 'merely colorable' or 'not significantly probative.' " *Bazemore*, 827 F.3d at 1333 (citation modified). If there is no genuine dispute of fact and the Court

7

determines that an applicable agreement to arbitrate exists, "the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

### III.   ANALYSIS

Lendvia argues that the clickwrap agreement created a valid, enforceable arbitration agreement with Mizel. *See* Mot. at 2–4. Lendvia contends that Webb's declaration and the documents attached are, under recent binding precedent, sufficient to show there is an enforceable agreement. *See id.* at 4 (citing generally to *Lamonaco*, 141 F.4th 1343). Accordingly, I should compel Mizel to arbitrate. *Id.* Alternatively, "[s]hould Mizel contrive some issue that disputes the formation of the arbitration agreement," I should hold a summary trial on the issue of the existence of such an agreement. *Id.*

Mizel "unequivocally denies the formation of any agreement with Lendvia (including any agreement to arbitrate or to delegate any issue to an arbitrator)." Resp. at 2. Mizel contends that Lendvia's evidence "does not show what Lendvia claims it shows, *i.e.* that Plaintiff Mizel herself visited Lendvia's website, entered her personal information, and agreed to online terms including arbitration." *Id.* "The first name, last name, and social security numbers—all datapoints that one applying for a loan would ensure are correct—do not belong to Mizel." *Id.*; *see also* Mizel Decl. ¶¶ 15–16. Mizel

8

swears that she did not enter the information on Lendvia's website, has never visited the website, has never given any personal information to Lendvia, did not agree to terms with Lendvia, and did not even know of the existence of Lendvia at the time that she purportedly executed the clickwrap agreement. *See* Resp. at 3; *see also* Mizel Decl. ¶¶ 3–6, 12–13. Mizel contends that Lendvia's evidence shows only "that *somebody* entered Mizel's email address[,] [home address,][1] and phone number into Lendvia's website, but that could have been done by anybody in the world." Resp. at 12. Thus, Mizel submits that there is no genuine dispute of material fact regarding the existence of an arbitration agreement, and I should deny the motion. *See id.*

In reply, Lendvia argues that, under *Lamonaco*, it has provided sufficient evidence. Reply at 2. That argument misses the point, as the factual disputes here diverge from those at issue in *Lamonaco*, where the parties disputed the process of contract formation. Here, Mizel disputes that *she* agreed to the contract. Indeed, Lendvia also does not respond directly to Mizel's declaration that she did not enter the information, has never visited Lendvia's website, given Lendvia her information, and that her social security number differs from that in the video. *See generally id.* at 2–8. Rather, Lendvia

---

[1] Although not mentioned by Mizel here, she does not dispute Lendvia's contention that the home address entered on the form is hers. *See* Mot. at 11–12; Reply at 7; *see generally* Resp. (failing to dispute the home address).

characterizes the information as mostly correct and contends that Mizel "misspell[ed her name] slightly." *See id.* at 7.

Lendvia also avers that Mizel failed to challenge the delegation clause, which must be enforced. *Id.* at 3–4. Thus, Mizel's allegations and contentions must be "reserved" for consideration by the arbitrator. *Id.* On this latter point, Lendvia ignores precedent that "[b]efore referring a dispute to an arbitrator," I must "determine[] whether a valid arbitration agreement exists." *Lamonaco*, 141 F.4th at 1346 (quoting *Coinbase*, 602 U.S. at 149). Mizel's arguments are relevant to the existence of the agreement. In any event, Mizel repeatedly challenged the delegation provision as an agreement that she did not reach with Lendvia. *See* Resp. at 2, 4, 8, 16.

Because the question is whether an agreement to arbitrate exists, state law controls. *See Bazemore*, 827 F.3d at 1329. Lendvia asserts that *both* California and Florida law apply, but without addressing how both apply or otherwise engaging with the conflicts-of-law issue. *See* Mot. at 15. Mizel avers that "Florida law applies." Resp. at 9 n.2. Neither party provides relevant case law or argument for their position. *See* Mot. at 15; Resp. at 9 n.2 (citing a district court order for the proposition that, in diversity cases, the forum state's choice of law governs but without acknowledging that this action arises under federal question jurisdiction).

10

The arbitration agreement itself calls for Wyoming law, at least regarding "the substance of all claims." *See* Webb Decl. at 21. Neither party requests Wyoming law for this issue. Even if they did, federal courts generally refuse to apply a choice-of-law clause to resolve contract formation issues because doing so presumes the applicability of the provision when the existence of the contract is still in question. *See, e.g.*, *Colkitt v. Oncology Servs. Int'l, Inc.*, No. 8:19-CV-2302-T-33AEP, 2019 WL 8273661, at *3 (M.D. Fla. Dec. 18, 2019); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012); *B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 439 F.3d 653, 661 n.9 (10th Cir. 2006).

Although it appears possible that the parties are diverse, the complaint alleges federal question jurisdiction. *See* Compl. ¶ 4; Mot. at 15 (describing Mizel as a citizen of Florida and Lendvia as a citizen of California). Thus, I must apply "the choice-of-law principles of the federal common law, which follows the approach of the Restatement (Second) of Conflict of Laws." *Chau Kieu Nguyen v. JP Morgan Chase Bank, NA*, 709 F.3d 1342, 1345 (11th Cir. 2013) (per curiam) (citation modified) (citing *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir. 1980)); *see Lichtman v. Bar Educ., Inc.*, No. 8:21-CV-1370-VMC-AEP, 2021 WL 4478249, at *3 (M.D. Fla. Sept. 30, 2021) (applying federal common law choice-of-law rules to

11

answer which state's contract law governs formation of an arbitration agreement in a case arising under federal question jurisdiction).

Because the parties have not made an "effective choice" of governing law, I must determine, by using "principles" and "contacts" outlined in the Restatement, which state, "with respect to [the formation of the contract], has the most significant relationship to the transaction and the parties." Restatement (Second) of Conflict of Laws § 188(1)–(2) (1971). Most of the enumerated contacts, such as the place of contracting and negotiation, are unhelpful because of the nature of the online clickwrap contract and the lack of knowledge regarding where the person—whether Mizel or someone else— who submitted the form on Lendvia's website was located. *See id.* § 188(2). Indeed, neither party (although presumably only Lendvia might know) has informed me—or even alleged—in which state the purported contract was accepted. Ultimately, the citizenship of the parties, *see id.* § 188(2)(e), is the only relevant contact.

Assuming that Lendvia is a citizen of California and Mizel is a citizen of Florida,[2] this leaves those two states as the options. The inquiry focuses on

---

[2] Mizel does not challenge Lendvia's citizenship contentions. *See generally* Resp. Further, she alleges that she is a resident of Florida. Compl. ¶ 7. This is sufficient to establish a presumption that she is domiciled in Florida. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1342 (11th Cir. 2011) (presuming that a defendant was domiciled at the residence he had at the time that the plaintiff filed suit (citing

12

which state, with respect to the issue at hand, has "the most significant relationship." *See id.* § 188(1). The issue is whether a contract was indeed formed, which if formed and enforced, would deprive a plaintiff of their preferred venue. On that score, I conclude that Florida has the most significant relationship to this issue. Florida's interest in ensuring the existence of purported contracts sought to be enforced against its citizens outweighs any interest that California might have. Further, both parties appear amenable to the use of Florida law, but only Lendvia argues for California law. *See* Mot. at 15; Resp. at 9 n.2. Thus, Florida law governs.

"To prove the existence of a contract under Florida law, the party seeking to enforce the contract must prove offer, acceptance, consideration, and sufficient specification of essential terms." *CEFCO v. Odom*, 278 So. 3d 347, 352 (Fla. 1st DCA 2019) (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)). "The party asserting the agreement must prove its existence by a preponderance of the evidence." *Lamonaco*, 141 F.4th at 1347 (citing *St. Joe Corp.*, 875 So. 2d at 381). Clickwrap agreements, like the one here, are "generally enforceable" in Florida. *Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 484 (Fla. 5th DCA 2022).

---

*Slaughter v. Toye Bros. Yellow Cab Co.*, 359 F.2d 954, 956 (5th Cir. 1966) (describing a "presumption of domicile in the jurisdiction where the party is a resident at the crucial time, which in this case is the time of the commencement of the action"))).

"Under Florida law, the central question is whether the parties mutually assented to be bound." *Lamonaco*, 141 F.4th at 1347. "In the clickwrap context, [the question of mutual assent] turns on whether the relevant terms were reasonably presented and whether the user took clear, affirmative steps to accept them." *Id.* (citing *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018) (per curiam)). Here, the parties dispute only whether Mizel accepted the terms and conditions. *See generally* Mot.; Resp.

As a threshold matter, Mizel argues that the Verified Consent recording is inadmissible evidence because it is not authenticated. Resp. at 13. Lendvia is correct that the Verified Consent recording qualifies as a business record under Federal Rule of Evidence 803(6), which Mizel does not dispute. *See* Reply at 4; Webb Decl. ¶¶ 1–3, 20 (establishing that the recording was a business record under Rule 803(6)); *see generally* Resp. (failing to contest that the recording is a business record). "Under Rule 902(11), an item of evidence is 'self-authenticating' if it is an 'original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)–(C).'" *United States v. Clotaire*, 963 F.3d 1288, 1293 (11th Cir. 2020). Although Mizel did not raise it, I note that, under *Clotaire*, the screenshots derived from the Verified Consent are also self-authenticated business records. *See id.* at 1293–94. The Rules of Evidence, therefore, present no bar to consideration of the Verified Consent recording.

14

On the issue of Mizel's acceptance, the parties' arguments essentially revolve around comparing their accounts of the facts to one of two Eleventh Circuit opinions involving clickwrap arbitration agreements: *Lamonaco* and *Bazemore*. *See* Mot. at 4, 23–24; Resp. at 11–12; Reply at 2–3.

In *Bazemore* the plaintiff successfully opposed arbitrating her claims. *See* 827 F.3d at 1327. The Eleventh Circuit affirmed on separate grounds that the defendant failed to meet its burden to show the existence of an arbitration agreement between the parties. *See id.* Georgia contract law governed *Bazemore*, but it is the same as Florida law for all relevant purposes. *See id.* at 1330 (describing Georgia contract law).

Although the plaintiff in *Bazemore* purportedly assented to the arbitration agreement by accepting terms and conditions found in a clickwrap agreement when she applied for a credit card over the Internet, there was "no evidence" that the plaintiff clicked on the required dialog box or otherwise consented via an "electronic exchange between [the plaintiff] and [the defendant or its agent]." *Id.* at 1327. Nor was there evidence that the website that the plaintiff viewed displayed the terms or conditions, much less required her to consent. *Id.* at 1327–28.

The defendant in *Bazemore* offered a declaration from a records custodian who stated in conclusory terms that the plaintiff accepted the terms

15

on or about a certain date. *Id.* at 1327. But the custodian did not assert that he had personal knowledge of that or produce documents in support. *Id.* The custodian also failed to assert that the contract he attached to his declaration was the same one that would have been sent to the plaintiff. *Id.* at 1328. Despite the custodian's claim that an agreement "would have been sent" to the plaintiff, the defendant failed to prove, or even assert, that an agreement was sent. *Id.* The Eleventh Circuit concluded that this dearth of proof did not even require a summary trial. *Id.* at 1333–34.

*Lamonaco* did not suffer from the same proof problem. There, the plaintiff sued under the Fair Credit Reporting Act and the defendant moved to compel arbitration. *Lamonaco*, 141 F.4th at 1345. In support, the defendant submitted a declaration from an employee that attested that the plaintiff enrolled in an online service and "that the enrollment process required her to input personal information and click a 'submit' button below a bolded notice referencing the service's Terms of Use." *Id.* The declaration included a screenshot of the webpage and a copy of the Terms of Use. *Id.* The plaintiff "[did] not contest these facts" or otherwise deny enrolling in the online service. *Id.* at 1348. Her sole contention was "that the declaration—*unrebutted*, signed under penalty of perjury, based on personal knowledge, and supported by documentation—[was] insufficient [under Florida law] to establish an

16

agreement by a preponderance of the evidence." *See id.* (emphasis added). Although the district court agreed with the plaintiff's argument, the Eleventh Circuit reversed the denial of the motion to compel and ordered the district court to grant the motion to arbitrate. *Id.* at 1348–49.

This case falls between *Bazemore* and *Lamonaco*. Lendvia's declaration includes far more details compared to the declaration in *Bazemore*. Webb attested to personal knowledge based on a review of the Verified Consent, which he attached along with a copy of the Terms of Use to which he attests Mizel agreed. Webb Decl. ¶¶ 1–3, 5, 13, 15–30; *id.* at 16–24. To be clear, differences remain between his declaration and the one in *Lamonaco*, as explained below. But on its face, Webb's declaration is closer to *Lamonaco* than *Bazemore*.

To begin, Lendvia's request that I grant the motion to compel based solely on *Lamonaco* misapprehends the relevant evidentiary differences. *See* Mot. at 4. *Lamonaco* turned on the fact that the movant's evidence of an agreement was "unrebutted." *Lamonaco*, 141 F.4th at 1348. Here, Mizel rebutted Lendvia's initial proof, and in reply Lendvia offered nothing more. *See* Mizel Decl. ¶¶ 2–6, 12–17; *see generally* Reply. The question now is whether a trial is required on the issue of contract formation.

17

I must consider whether Lendvia's proof is sufficient to meet its burden and, thus, in the light of Mizel's declaration, raise a genuine dispute of material fact as to whether Mizel agreed to the clickwrap contract. It remains Lendvia's burden is "to prove the existence of an agreement by a preponderance of the evidence." *Lamonaco*, 141 F.4th at 1349. To meet that burden, Lendvia relies on Webb's declaration alone.

To refresh, Mizel's declaration unequivocally states that she did not enter the information on Lendvia's website, authorize anyone else to do so, has never even visited the website, the name and social security number on the form are not hers, and she has never had a relationship with (or even knowledge of) Lendvia prior to this action. *See* Mizel Decl. ¶¶ 3–6, 12–17. On the other hand, Webb declares that "the user [who filled out the form] was Plaintiff Liza Mizel," "Mizel then clicked 'Continue,' expressing her understanding and consent that she acknowledged, agreed, and consented to the Privacy Policy and Terms of Use," and "[b]y clicking 'Submit,' Mizel again expressed her . . . consent . . . to the Privacy Policy and Terms of Use." Webb Decl. ¶¶ 27–28, 30.

Webb's attestations are based on his personal knowledge, which he developed by "review[ing] the documents referred to herein." *Id.* ¶ 3. The only documents "referred to herein" that are relevant for establishing who filled out

18

the form are the Verified Consent and the screenshots derived from it. *See generally id.* Webb does not claim that the Verified Consent establishes *who* the user completing the agreement is, just that "*the user* completed the clickwrap agreement." *Id.* ¶ 16 (emphasis added). Nor does he claim to have independent knowledge of Mizel's social security number. Rather, Webb assumes that the social security number is Mizel's. *See id.* ¶¶ 26–27. Thus, his contention that the user is Mizel is a conclusion that he reaches because the user entered Mizel's phone number, email address, and home address on the form. *See id.* ¶¶ 27–29. To discount this conclusion entirely and proceed without a trial on contract formation would require a credibility determination that I cannot make on the papers alone.

That said, the differences from *Lamonaco* are not insignificant. In *Lamonaco*, the employee attested that the plaintiff signed up for the online service, which could occur only after consenting to the clickwrap agreement, based on his "review of . . . membership enrollment data maintained in the regular course of business." *Lamonaco v. Experian Info. Sols., Inc.*, No. 6:23-CV-1326-PGB-LHP, 2024 WL 1703112, at *1 (M.D. Fla. Apr. 19, 2024), *rev'd and remanded*, 141 F.4th 1343 (11th Cir. 2025); *see Lamonaco*, 141 F.4th at 1345. Further, the employee attested that the plaintiff had continuously used the online service, *Lamonaco*, 2024 WL 1703112, at *4, and identified when

19

the plaintiff had changed her membership level, *Lamonaco*, 141 F.4th at 1346. In *Lamonaco*, whether the underlying business records showed that the plaintiff, rather than someone else, had enrolled was not called into question, and the plaintiff did not deny enrolling in and using the service. *See Lamonaco*, 141 F.4th at 1348. Here, there is no claim, much less evidence, that Mizel used Lendvia's service after she purportedly signed up and the only evidence that she signed up features a different, albeit similar, name and allegedly someone else's social security number. Despite these differences, I conclude that Lendvia has—narrowly—met its initial burden.

Mizel does not submit evidence of her social security number. She merely denies, albeit under penalty of perjury, that the social security number in the Verified Consent is not hers. *See* Mizel Decl. ¶¶ 16, 22. Although other evidence or lack thereof bears on the formation question, whether the social security number on the application matches Mizel's social security number is of particular significance to the identity question. Lendvia, through Webb, asserts that Mizel's social security number is shown in the Verified Consent. *See* Webb Decl. ¶¶ 26–27. Mizel denies this contention. Mizel Decl. ¶ 16. Thus, there is a genuine dispute of material fact as to whether Mizel agreed to arbitrate her dispute with Lendvia. Accordingly, I must hold a summary trial on the issue of contract formation. *See* Mot. at 24.

The trial will be a bench trial. To exercise her statutory right to a jury trial on the issue of contract formation, Mizel had to specifically demand one by the time that she responded in opposition to the motion to compel arbitration. *See Burch*, 861 F.3d at 1348–50; *id.* at 1349 n.17. The only demand for a jury trial in this action is the general demand in the complaint, *see* Compl. at 19, which is not a specific demand for a jury trial under Section 4 of the FAA, *see Burch*, 861 F.3d at 1349–50.

## IV.    CONCLUSION

Because there is a genuine dispute of material fact as to whether an agreement to arbitrate exists between Lendvia and Mizel, I must hold a summary trial.

Accordingly, the following is **ORDERED:**

1. Lendvia's Motion to Compel Arbitration (Doc. 16) is **DENIED without prejudice.** Lendvia may renew its motion if successful in proving that Mizel entered into the contract.

2. The Court will hold a bench trial under 9 U.S.C. § 4 to determine the existence of a binding arbitration agreement.

3. The bench trial is scheduled for 1:00 p.m. on **March 30, 2026**. Both parties must submit their respective witness and exhibit lists no later than **March 23, 2026**.

4. The stay on discovery will continue until the conclusion of the bench trial with the exception that, for thirty days following the entry of this order, the parties may conduct discovery related to the narrow issue of whether Mizel agreed to the clickwrap contract.

**ORDERED** in Tampa, Florida, on February 17, 2026.


Kathryn Kimball Mizelle
United States District Judge